**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| ON THE MOVE, INC. §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>CURBSIDE UPFITTERS LLC, ROBERT §<br>MIKALONIS, AND JASON LIVELY §<br>§<br>Defendants. § | CIVIL ACTION NO. _____<br>5:22-cv-188 |

**VERIFIED COMPLAINT**

Plaintiff On The Move, Inc. ("OTM") bring this "Complaint" for (1) breach of contract, (2) violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq., (3) violation of the Texas Uniform Trade Secrets Act, (4) tortious interference with existing contracts, (5) tortious interference with prospective contracts, and (6) civil conspiracy against Defendants Curbside Upfitters ("Curbside"), Robert Mikalonis and Jason Lively (collectively "Defendants") and shows the following:

**PARTIES**

1.      Plaintiff On The Move, Inc. is a Corporation existing and organized under the laws of the State of Michigan and registered as a foreign for-profit corporation in the state of Texas.  It has a principal place of business at 28825 IH 10 West, Boerne, Bexar County, Texas 78006.

2.      Defendant Curbside is a limited liability company existing and organized under the laws of the State of Texas.  It has a principal place of business at 108 Enterprise Parkway, Boerne, Texas 78006. Curbside has a registered agent, Legal Corp Solutions, LLC, who may be served at the registered address of 700 Lavaca Suite 1400, #5782, Austin, Texas 78701.

3.      Defendant Mikalonis is an individual employed by Curbside and working at 108 Enterprise

Parkway, Boerne, Texas 78006. On information and belief, Mikalonis lives and resides at 271411

Clematis Falls, Boerne, Bexar County, Texas 78015 and he may be served at this address.

4.      Defendant Lively is an individual employed by Curbside and working at 108 Enterprise

Parkway, Boerne, Texas 78006. On information and belief, Lively lives and resides at 18130

Talavera Ridge #752, San Antonio, Bexar County, Texas 78257 and he may be served at this

address.

## JURISDICTION AND VENUE

5.      This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*,

as amended, and Texas statutory and common law. This Court has subject matter jurisdiction under

28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims under 28 U.S.C. §

1367.

6.      This Court has personal jurisdiction over all Defendants because Mikalonis and Lively

each live in Bexar County, Texas and Curbside has a principal place of business in Kendall County,

Texas..

7.      Venue is proper in this court by reason of 28 U.S.C. § 1391 as the majority of events

forming the basis for this suit occurred in this district. Additionally, the Western District of Texas

is a proper venue because at least one of the Defendants resides in this district and all Defendants

are residents of Texas.

## FACTS

**A. OTM is in the business of building, repurposing and selling food trucks.**

8.      In September 2012, OTM began investigating the possibility of adding food truck

manufacturing, distributing, and selling to its line of business. OTM started researching

manufacturers and eventually hired a box truck company to design and build its first food truck.

OTM wanted an innovative approach, so it designed a "slide out" style of truck.

9.    OTM's first truck was produced as a prototype and not as large as expected. As a result, OTM found an alternative manufacturer: K & D Custom Coach of Indiana, who built a second truck.

10.   In April 2014, OTM sold its first food truck. A second customer signed a contract and OTM started construction. A third truck was built by the Department of Justice.

11.   By January 2015, OTM was once again looking for a manufacturer. OTM invested considerable resources looking for an acceptable food truck manufacturer that could deliver a food truck to OTM that was acceptable in terms of specifications and pricing. After two and a half years in the food truck business, OTM finally found a suitable manufacturer, Shook a/k/a Rolltechs. Over time, OTM gained notoriety in the industry with its novel food truck design.

12.   OTM later purchased a food truck manufacturing company in Detroit for OTM's smaller food trucks. The company was later closed due to high costs.

**B.  Mikalonis and Lively were salesman for OTM and helped grow OTM's food truck business.**

13.   OTM hired Mikalonis on April 16, 2012. Mikalonis was hired as a sales associate for OTM. Over time, Mikalonis's efforts were focused on OTM's specialty truck business, especially food trucks. At the start of his employment, Mikalonis executed a Human Resources Policy Confidential Information and Inventions Agreement + Non-Compete ("Mikalonis Confidentiality + Non-Compete").[1] The Mikalonis Confidentiality + Non-Compete provided in relevant part that Mikalonis would not compete against OTM in any business for at least two (2) years after his employment with OTM terminated.

14.   The Mikalonis Confidentiality + Non-Compete also required Mikalonis to refrain from disclosing or using any trade secrets, innovations, processes, information, recruiting practices,

---

[1] **Exhibit A.**

records and specifications of OTM for his own benefit or for the benefit of any other individual or business. Protected information included: OTM's customers and prospective customers; OTM's personal relationships with its customers; OTM's purchasing, pricing, cost, and sales arrangements with customers and suppliers; OTM's marketing techniques and business plans and strategies; OTM's customer's financial information; and OTM's customer lists, sales reports, inventory reports, cost reports, and other proprietary information received during company meetings. Mikalonis also agreed to maintain the confidentiality of OTM's proprietary information or for two (2) years beyond his employment with OTM.

15.     In June 2014, Mikalonis was promoted to Director of Custom Vehicles (i.e., food trucks) when OTM purchased Detroit Custom Coach LLC. Over time, Mikalonis's responsibilities included: supervising the Detroit manufacturing company; managing, designing and selling OTM's food trucks.

16.     OTM hired Lively on August 1, 2017. Like Mikalonis, Lively was hired as a sales associate for OTM's business. At that time, Lively executed a Human Resources Policy Confidential Information and Inventions Agreement + Non-Compete ("Lively Confidentiality + Non-Compete").[2] The Lively Confidentiality + Non-Compete is identical in substance to the Mikalonis Confidentiality + Non-Compete.

17.     Over time, Lively's efforts were focused on OTM's specialty truck business, especially food trucks. Between Lively and Mikalonis, and with respect to food trucks, they would evaluate customer needs, lay out and design the equipment in the truck and provide a quote to each customer. Once a customer accepted a quote, Lively and Mikalonis would contact all suppliers and make sure the build went according to plans.

---

[2] **Exhibit B.**

18.     While working for OTM, Mikalonis and Lively were two of several employees working in OTM's food truck business. All of OTM's sales employees helped sell food trucks, Mikalonis and Lively were always the leads and heavily involved. Mikalonis and Lively had access to customer information, pricing information, vendor information and other proprietary information. Mikalonis and Lively benefitted from the know-how and negative know-how they developed while working for OTM. OTM paid Mikalonis and Lively to learn about OTM's food trucks in intimate detail. OTM also provided Mikalonis and Lively with resources to learn and use CAD software. Moreover, Mikalonis and Lively had access to proprietary information by virtue of their ranks within OTM: Lively reported to Mikalonis and Mikalonis reported to OTM's CFO Brian Obeck and CEO Susan Parra.

19.     The photo below shows a project that Mikalonis and Lively worked on for Andretti Karting and Games, while employed by OTM:



20.     While working for OTM, Mikalonis and Lively worked on numerous projects using a

variety of vehicles and other structures:



For example, while working for OTM, Mikalonis and Lively worked on several projects using trailers, including projects for Wendy's and Fire Pie.

21.     As a result of these and similar efforts, OTM invested considerable time, money, and other resources in its food truck business, which include its trade secrets and other confidential information.

22.     OTM takes measures to protect this information. For example, OTM keeps much of this information under password protected computers. OTM discloses this information on a need-to-know basis and requires employees to sign confidentiality agreements upon employment and exit agreements at termination/resignation.

23.     OTM's confidential information is proprietary and generally unknown to others in the

marketplace. For this reason, OTM's confidential information gives OTM a competitive advantage.

**C. Mikalonis and Lively formed Curbside while employed by OTM.**

24.     In late March/early April 2019, OTM's food truck business suffered a major set-back: Mikalonis reported that Rolltechs intended to increase manufacturing costs by a substantial amount.

25.     Unbeknownst to OTM, Mikalonis and Lively filed a certificate of formation for Curbside on April 22, 2019.

26.     To turn the Rolltechs dilemma around, OTM increased efforts on its food truck business. OTM's top leaders—including president and CEO, Susan Parra, personally assisted Mikalonis and Lively by trying to find a new manufacturer. To that end, OTM expected Mikalonis and Lively to work hard and assist with the increased efforts.

27.     Lively took the opposite approach. On April 23, 2019, Lively requested an immediate three day vacation. He stated he was concerned because OTM's food truck business was in limbo and that he was not comfortable with OTM's food truck designs. Lively had never expressed those concerns before.

28.     In light of Lively's apathy and untimely vacation request, OTM terminated him.

29.     On April 30, 2019, during an exit interview with OTM, Lively executed a Confidential Information Exit Agreement ("Lively Exit Agreement").[3]

30.     During this time, Mikalonis complained that he couldn't sell OTM's food trucks with the increased costs imposed by Rolltechs.

31.     Mikalonis's annual review was the first week of May and OTM assured him OTM still

---

[3] **Exhibit C.**

supported the food truck operation and OTM was willing to put in the effort to locate a manufacturer that would allow OTM to be profitable.  Mikalonis insisted there was no way OTM could be competitive.

32.     On May 14, 2019, Mikalonis offered his resignation to OTM. His resignation notice stated his last day would be May 24, 2019. He informed OTM that that he might look for work in the restaurant business.

33.     It was clear during the last few weeks of Mikalonis's employment that he was apathetic toward finding a new manufacturer. Mikalonis provided minimal analysis, and nothing that would lead to a solution. He made no efforts to help OTM remain competitive and profitable.

34.     On May 24, 2019, during his exit interview with OTM, Mikalonis executed a Confidential Information Exit Agreement ("Mikalonis Exit Agreement").[4] The Mikalonis Exit Agreement is identical to the Lively Exit Agreement. In the Exit Agreements, Mikalonis and Lively acknowledged their existing obligations of confidentiality, among other things. Moreover, Mikalonis and Lively eache owed fiduciary duties to OTM because OTM employed them in positions of trust and confidence and entrusted each of them with access to confidential information.

35.     By the time Mikalonis left OTM, he incurred several sizeable expenses for projects he had no intention of completing. For example, Mikalonis placed orders for two F-550 chassis, which he never sold, resulting in a loss of $86,000 to OTM. Mikalonis also ordered the construction of two show trucks, which cost several hundred thousand dollars. And financiers ultimately repossessed three food trucks Mikalonis leased on OTM's behalf. Additionally, OTM registered as a sponsor at several conventions in 2018—e.g., National Restaurant Association and Texas Restaurant

---

[4] **Exhibit D.**

Association—that OTM had to back out of because of Mikalonis and Lively's departure. OTM paid a lot of money for the sponsorships and was not refunded the money. Mikalonis spent a significant amount of OTM's money shortly before resigning and left OTM to deal with it.

36.     In August 2019, OTM learned Mikalonis and Lively opened Curbside[5] to compete directly with OTM. Mikalonis and Lively necessarily rely on much of the information they learned while working for OTM.

37.     On information and belief, Mikalonis and Lively:

- Incurred significant expenses on OTM's behalf in an attempt to dissuade OTM from continuing with its food truck business;

- Requested vacation time to prepare Curbside's food truck business;

- Made no efforts to help OTM find a new manufacturer;

- Used and continue to use OTM's trade secrets, know-how and negative know-how, among other confidential information to start up and operate Curbside;

- Solicit OTM's customers and prospective customers; and

- Solicit OTM's vendors.

38.     Because Lively and Mikalonis stopped working for OTM in April and May 2019, their activities involving food trucks clearly violate the Restrictive Covenant contained in their respective Confidentiality + Non-Compete agreements.

**D. OTM discovered Defendants' tortious acts and attempted to resolve the dispute.**

39.     OTM attempted to resolve the matter with Defendants. OTM contacted Defendants on September 3, 2019.[6] In the September 3rd letter, OTM reminded Mikalonis and Lively of their restrictive covenants under the non-compete and insisted Curbside cease all operations.

---

[5] **Exhibit E**; **Exhibit F**.
[6] **Exhibit G.**

Defendants responded *pro se* on September 4, 2019.[7] Defendants stated no intention of ceasing operation. Defendants alleged OTM had previously represented OTM would discontinue its food truck business. This allegation couldn't be further from the truth. When Lively and Mikalonis left OTM, OTM had identified several options and necessary steps to remain in operations. At that time, OTM had six builds in production at Rolltechs and about five to seven used trucks or chassis in OTM's inventory.

40.    OTM sent Defendants a second letter on September 9, 2019.[8] Despite OTM's repeated warnings and efforts to resolve this matter without the involvement of the Court, Defendants had no intention of ceasing operations. Defendants denied any wrongdoing and informed OTM that they would continue carrying on, business as usual.

41.    Mikalonis and Lively's departure created a backlog for OTM, making it difficult for OTM to accept and complete new jobs. It was initially difficult and time consuming for OTM to provide new quotes.  And OTM transferred multiple builds over to Rolltechs, since Rolltechs would be doing the remaining work. OTM incentivized Rolltechs by allowing Rolltechs to retain any profit on such builds.

### E.  2019 Lawsuit and Mediated Settlement Agreement

42.    On September 26, 2019 OTM filed a lawsuit against the Defendants and moved for a preliminary injunction. The 2019 lawsuit was filed in the United States District Court for the Western District of Texas, Civil Action No. 5:19-cv-01164. Prior to the preliminary injunction hearing, the Parties mediated the dispute. The mediation concluded with the Parties executing a Mediated Settlement Agreement ("MSA"). The MSA includes a confidentiality provision, so Plaintiff will only generally reference the MSA in this Complaint.

---

[7] **Exhibit H.**
[8] **Exhibit I.**

43.     The MSA required payments and financial reports from Defendants to OTM.

44.     The MSA also provided OTM with the right to audit Curbside's financials on an annual basis.

**F.  Defendants Breached the MSA.**

45.     OTM received its first quarterly report and payment from Defendants on April 20, 2020. Given its experience in the food truck business, OTM is familiar with food truck projects. OTM suspected that the payment from Defendants was significantly less than was required by the MSA.

46.     Subsequent quarterly reports and payments from Defendants were even less encouraging, furthering Plaintiff's suspicion that Defendants were not complying with their payment obligations under the MSA.

47.     In April 2021, OTM contacted Defendants about the quarterly reports and payments and informed Defendants that OTM intended to exercise its audit right. Over the course of several months, the Parties discussed the particulars of how the audit would be performed.

48.     OTM retained the accounting firm Fisher, Herbst & Kemble, P.C. ("FHK") to perform the audit. FHK performed an audit and prepared a report. It is clear from FHK's report that Defendants significantly underpaid OTM, therefore materially breaching the MSA. OTM contacted Curbside and asked Defendants to pay OTM for the amounts owed. Defendants refused.

49.     Given the apparent *impasse*, the Parties invoked a provision in the MSA requiring the parties to mediate any disputes concerning performance of the MSA. The Parties mediated the dispute with Don Philbin on Wednesday, January 12, 2022.

50.     Mediation was unsuccessful. Defendants still owe OTM money pursuant to the MSA, and Defendants are continuing to misappropriate OTM's trade secrets without proper compensation. The communications from Defendants—and Defendants' website—show that Defendants are still performing food truck fabrication services for several customers of OTM (including Andretti

Karting and Games); Defendants are using pricing models learned from OTM; and Defendants are using other know-how learned from OTM.

51.     In short, Defendants enjoy the benefits of OTM's trade secrets and prior settlement, without fully compensating OTM pursuant to the MSA.

## CAUSES OF ACTION

### COUNT 1: BREACH OF MEDIATED SETTLEMENT AGREEMENT AND RELEASE

52.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

53.     The MSA is a valid, enforceable contract between On The Move, Inc. on the one hand, and Curbside, Mikalonis, and Lively, on the other.

54.     OTM, as a signatory to this agreement, is the proper party to sue for breach of contract. OTM performed its contractual obligations.

55.     Curbside, Mikalonis, and Lively breached the MSA by failing to comply with their payment obligations under Exhibit A, Subjection 2) a. of the MSA.

56.     Defendants' acts have caused great harm and damage to OTM.  The amount of these damages is not yet determined.  OTM seeks actual damages, exemplary damages, and such additional relief as may be deemed appropriate and awarded by this Court.

57.     OTM is entitled to recover its attorney's fees in pursuit of this count.

### COUNT 2: BREACH OF CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

58.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

59.     The Confidential Information and Inventions Agreement was a valid, enforceable contract between On The Move, Inc. and Defendants Mikalonis and Lively.

60.    OTM, as a signatory to this agreement, is the proper party to sue for breach of contract. OTM performed its contractual obligations.

61.    Mikalonis and Lively breached by opening and operating a competing food truck business in violation of at least the Restrictive Covenant of their respective Confidentiality + Non-Compete agreements.

62.    Mikalonis and Lively further breached, on information and belief, by using and disclosing OTM's confidential information in violation of at least paragraph 2 of the Confidentiality + Non-Compete agreements.

63.    Defendants' acts have caused great harm and damage to OTM.  The amount of these damages is not yet determined. OTM seeks actual damages, exemplary damages, and such additional relief as may be deemed appropriate and awarded by this Court.

64.    Defendants' acts have and will continue to cause OTM irreparable injury. Based on information and belief, Defendants will continue their willful acts unless enjoined by this Court. OTM seeks both preliminary and permanent injunctive relief, or alternatively specific performance.

65.    OTM is entitled to recover its attorney's fees in pursuit of this count.

### COUNT 3: BREACH OF CONFIDENTIAL INFORMATION EXIT AGREEMENT

66.    OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

67.    The Mikalonis and Lively Exit Agreements were each a valid, enforceable contract between OTM and Mikalonis and Lively.

68.    OTM, as a signatory to this agreement, is the proper party to sue for breach of contract. OTM performed its contractual obligations.

69.     On information and belief, Mikalonis and Lively breached their contracts by using and disclosing OTM's confidential information in violation of their Exit Agreements.

70.     Defendants' acts have caused great harm and damage to OTM.  The amount of these damages is not yet determined.  OTM seeks actual damages, exemplary damages, and such additional relief as may be deemed appropriate and awarded by this Court.

71.     Defendants' acts have and will continue to cause OTM irreparable injury. Based on information and belief, Defendants will continue their willful acts unless enjoined by this Court. OTM seeks both preliminary and permanent injunctive relief, or alternatively specific performance.

72.     OTM is entitled to recover its attorney's fees in pursuit of this count.

### COUNT 4: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS: CUSTOMER CONTRACTS

73.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

74.     OTM had valid contracts with several customers and vendors.

75.     On information and belief, Defendants have willfully and intentionally interfered with such contracts. Such interference by Defendants has been the proximate cause of injury to OTM.

76.     Defendants' acts have caused great harm and damage to OTM. The amount of these damages is not yet determined. OTM seeks actual damages, exemplary damages, and such additional relief as may be deemed appropriate and awarded by this Court.

77.     Defendants' acts have and will continue to cause OTM irreparable injury. Based on information and belief, Defendants will continue their willful acts unless enjoined by this Court. OTM seeks both preliminary and permanent injunctive relief against further tortious acts by Defendants.

### COUNT 5: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

78.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

79.     There was a reasonable probability that OTM would enter into business relationships with several customers and vendors.

80.     On information and belief, Defendants have intentionally interfered with those business relationships.

81.     On information and belief, such interference by Defendants was tortious and willful.

82.     Defendants' acts have caused great harm and damage to OTM.  The amount of these damages is not yet determined.  OTM seeks actual damages, exemplary damages, and such additional relief as may be deemed appropriate and awarded by this Court.

83.     Defendants' acts have and will continue to cause OTM irreparable injury. Based on information and belief, Defendants will continue their willful acts unless enjoined by this Court. OTM seeks both preliminary and permanent injunctive relief against further tortious acts by Defendants.

### COUNT 6: MISAPPROPRIATION OF A TRADE SECRET IN VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT

84.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

85.     The Federal Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq., entitles OTM to relief as

to all the Defendants.

86.   OTM's trade secrets have actual or potential independent economic value because they are generally unknown and not readily ascertainable by third parties.

87.   The acts of Mikalonis and Lively complained of herein constitute misappropriation under 18 U.S.C. § 1836 of OTM's trade secrets, including for example that:

> (a)   Mikalonis and Lively acknowledged the ownership of valuable trade secrets belonging to OTM in agreeing to the terms of the Confidentiality + Non-Compete agreements and the Exit Agreements;

> (b)   The Agreements' definition of trade secrets, and the information that OTM claims are valuable trade secrets herein—which include, OTM's information concerning customer information, pricing information, vendor information know-how, negative know-how and other proprietary information—conforms to the statutory definition provided under 18 U.S.C. § 1839;

> (c)   OTM took reasonable measures to protect its trade secrets; and

> (d)   Upon information and belief, Mikalonis and Lively intentionally and knowingly engaged in a pattern of behavior that used and disclosed OTM's trade secrets, without OTM's express or implied permission, to Curbside and third-parties.

88.   OTM will be irreparably harmed unless Defendants are enjoined from further use or disclosure of OTM's trade secret or confidential information.

89.   Use of OTM's trade secret or confidential information by Defendants will continue unless enjoined by this Court. OTM therefor request a preliminary and permanent injunction issue against all Defendants to prevent use of OTM's trade secrets.

90.   OTM requests actual damages and any additional award for unjust enrichment that the

Court in its judgment finds is warranted.

91.     Upon information and belief, the misappropriation complained of herein was willful and malicious, and OTM hereby request enhanced damages be applied to any damages award as permitted by statute.

**COUNT 7: MISAPPROPRIATION OF A TRADE SECRET IN VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT**

92.     OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

93.     The Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001, et seq., entitles OTM to relief as to all the Defendants.

94.     OTM owns valuable trade secrets, including without limitation the trade secrets identified above. The definition of trade secrets provided in the Confidentiality + Non-Compete agreements conforms to the statutory definition provided under Tex. Civ. Prac. & Rem. Code §134A.002.

95.     OTM's trade secrets and confidential information were subject to reasonable efforts to keep them confidential, such as limiting access, by the constraints imposed under the terms of several applicable contracts, and through OTM's use of non-disclosure agreements signed with independent contractors.

96.     OTM's trade secrets have actual or potential independent economic value because they are generally unknown and not readily ascertainable by third parties.

97.     Upon information and belief, Defendants misappropriated OTM's trade secrets, including because they were aware of the trade secrets and they used and/or disclosed them to Curbside and/or third-parties without the consent of OTM.

98.     Defendants acquired them under circumstances giving rise to a duty to maintain its secrecy. And Defendants misappropriated OTM's trade secrets because they used and/or disclosed OTM's

trade secrets in a manner that breached their duty to maintain the secrecy.

99.     As a result of Defendants' misappropriation of OTM's trade secrets or confidential information, OTM has been damaged and Defendants have benefited.

100.    The acts of Defendants are in violation of Tex. Civ. Prac. & Rem. Code, §§ 134A.001 through .008, also known as the Texas Uniform Trade Secrets Act.

101.    OTM will be irreparably harmed unless Defendants are enjoined from further use or disclosure of OTM's trade secret or confidential information.

102.    Use of OTM's trade secret or confidential information by Defendants will continue unless enjoined by this Court. OTM therefor requests a preliminary and permanent injunction issue against all Defendants to prevent use of OTM's trade secrets.

103.    OTM requests actual damages and any additional award for unjust enrichment that the Court in its judgment finds is warranted.

104.    Upon information and belief, the misappropriation complained of herein was willful and malicious, and OTM hereby request enhanced damages be applied to any damages award as permitted by statute.

## COUNT 8: CIVIL CONSPIRACY

105.    OTM realleges and incorporates herein the allegations of the preceding paragraphs herein above.

106.    OTM is entitled to relief under Texas common law against Defendants for their conspiracy to wrongfully harm OTM.

107.    One or more Defendants committed the torts of tortious interference with a contract, misappropriation of a trade secret under federal and/or Texas law, breach of fiduciary duty and breach of contract.

108.    The Defendants formed a combination of two or more persons.

109.    On information and belief, Defendants intentionally set out to unlawfully obtain OTM's trade secrets for the purpose of obtaining an unfair competitive advantage, for pecuniary benefit, and to usurp the intellectual property of OTM.

110.    On information and belief, Defendants agreed to engage in the misappropriation of OTM's trade secrets through their conduct, thereby demonstrating a meeting of the minds to commit conspiracy.

111.    On information and belief, Defendants committed multiple unlawful and overt acts in furtherance of the conspiracy as detailed herein.

112.    Defendants' conspiracy proximately caused actual damages, as well as corresponding loss of profits.

## PRAYER

### A. Requested Relief

Accordingly, OTM asks the Court to enter judgment against Defendants and grant the following relief to OTM:

    (a) Judgment be entered in favor of OTM and against Defendants for each of the above counts;

    (b) Entry of an injunction pursuant to applicable federal, state, and/or common law enjoining Defendants, their officers, agents, employees, servants, attorneys, successors, and assigns, and all those controlled by, acting on behalf of, in privity with, or acting in concert or active participation with Defendants, from using, copying, publishing, disclosing, transferring, or selling OTM's Trade Secrets or other confidential and proprietary information that may be determined not to be Trade Secret information, or any product that is based on or incorporates part or all of OTM's Trade Secrets or other confidential and proprietary information, and from

obtaining any commercial advantage or unjust enrichment from their misappropriation of OTM's Trade Secrets or other confidential and proprietary information;

(c) Entry of an injunction pursuant to applicable federal, state, and/or common law requiring Defendants, their officers, agents, employees, servants, attorneys, successors, and assigns, and all those controlled by, acting on behalf of, in privity with, or acting in concert or active participation with Defendants to return to OTM any and all of its Trade Secrets and other confidential and proprietary materials that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing OTM's Trade Secrets and other confidential information;

(d) An order compelling  Defendants to comply with their continuing obligations as set forth above;

(e) The imposition of a constructive trust for the benefit of OTM upon

    a.   all assets misappropriated or used by one or more Defendants in violation of their contractual obligations to OTM, and all OTM trade secrets misappropriated by Defendants; and

    b.   all gains, including, but not limited to, any profits of, equity interests in, and/or increases in the value of equity interests in, Curbside, derived from the breach of any agreements with OTM, or from any misappropriation of OTM's trade secrets by Defendants;

(f) Judgment awarding OTM all actual and punitive damages to which it is entitled;

(g) Judgment awarding OTM pre-judgment and post-judgment interest;

(h) Judgment awarding OTM its costs, expenses, and reasonable attorneys' fees; and

(i)  Judgment awarding any other and further relief as the Court deems just and proper.

**B. Jury Demand**

OTM hereby demands a trial by jury on all issues so triable.

Date: February 28, 2022

Respectfully submitted,

GUNN, LEE & CAVE, P.C.
8023 Vantage Drive, Suite 1500
San Antonio, Texas 78230
210/886-9500 Phone
210/886-9883 Fax

/s/ Nick Guinn

Nick Guinn
State Bar No. 24087642
nick@gunn-lee.com
Brandon T. Cook
State Bar No. 24084166
brandon.cook@gunn-lee.com

**ATTORNEYS FOR PLAINTIFF**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ON THE MOVE, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. _____ |
| v. | § | |
| | § | |
| CURBSIDE UPFITTERS LLC, ROBERT | § | |
| MIKALONIS, AND JASON LIVELY | § | |
| | § | |
| Defendants. | § | |

## **VERIFICATION**

I, Susan Parra, on behalf of On The Move, Inc., verify under penalty of perjury that I have read the above complaint and its contents. I also verify that, to the best of my knowledge and recollection, the matters stated in the complaint are true and correct.

Executed this 24 day of February, 2022.

Susan Parra
President and CEO